second case is 23-1731 Scott v. Baltimore County. Whenever the lawyers are ready, we'll be pleased to hear from you. Thank you.  Mr. Hoffman. Thank you and may it please the court. My name is Howard Hoffman and with me today is attorney Jordan Liu and we are attorneys from Rockville, Maryland and it is our distinct pleasure to represent 550 hardworking individuals in this Federal Fair Labor Standards Act case which is also known as the FLSA. Before I speak about the details, I think this case is important to note that these are the rare but perfect circumstances in which the FLSA can apply to incarcerated individuals. That is because Baltimore County saw an opportunity to go into business and appropriate the labor of these incarcerated. Once Baltimore County was operating a veritable business in interstate commerce, the FLSA applies and summary judgment should not have been granted. Baltimore County is not entitled to an unfair advantage. This court must protect not just these workers but workers throughout the recycling industry as well as honest employers who pay the full minimum wage. Now, can I ask you about the purpose question and whether there's a rehabilitative purpose and what role that plays? So, conceptually, one of the questions that strikes me as really hard in this case is when we say purpose, do we mean so like so I understand our cases to basically say we have to ask sort of what is the purpose of this and then it strikes me as a problem because like almost everything in the world has more than one purpose and so when I say is there a rehabilitative purpose, do I mean or a non-rehabilitative purpose? Do I mean sole purpose, predominant purpose, substantial purpose, or any amount of purpose? What do you think is the right answer to that question? I think the proper answer and it's based on case law in this area from the FLSA cases involving trainees is who benefits, who gets the primary purpose? The primary purpose. That's correct. And we evaluate this under the totality of circumstances. And the only reason I say that is like, I mean, it strikes me as too obvious to need almost be said that like, is there a rehabilitative purpose? I mean, sure. Is there a non-rehabilitative purpose? Obviously, yes. And so then, so it turns out it might actually matter to me like what the level of purpose is because on some level, forcing, inviting, forcing incarcerated people to do work has some rehabilitative purpose in the sense of like doing work gives you skill, you know, makes you responsible to do work so like I can come up with some rehabilitative purpose for, I mean, operating a prison sweatshop. I could come up with a rehabilitative purpose for that. But I also could like, also generally speaking true that in these situations there will almost always be some non-rehabilitative purpose. So you think the right test is primary purpose? Precisely, Your Honor. It should be the primary purpose. Who benefited more from this relationship? The Department of Public Works from Baltimore County? Or do the inmates benefit primarily from this relationship? Can I ask you what I think is a related question? There's the question about like, you know, any purpose or primary purpose. But then whose purpose are we supposed to be looking at? Do we look at the purpose of DOC in making the inmates available? Or do we look at the purpose of DPW in wanting to use inmate labor? I think what's appropriate here is to look at the putative employer, which would be DPW, and whether they were the primary beneficiary of this labor and received, and that this work program was for the primary purpose of, in this case, of course, bailing recyclable materials for sale and interstate commerce. And what's your response to the argument that, at least as a matter of like legal existence, there is no such thing as DPW? DPW is Baltimore. Well, DPW is, in fact, distinct from Baltimore. Does it have a separate legal existence? It does not have a separate legal existence. But unlike the other work details in Baltimore County, DPW paid these workers for their labor. And DPW, what we, what I believe the proper focus should be on is, I believe what the proper focus should be on is the, in order to avoid a narrow, grudging interpretation of the term employee, of course, is the focus should be on the status of these workers in this putative employment relationship and not what ultimate control they're in. And there may, that they may have been subjected to at some other times during the day. So when you look at it through that proper lens, I believe, using the totality of circumstances based on an economic reality, DPW was the employer, even though the Department of Corrections housed these inmates. Counsel, can I take you back to the, we're talking about purpose, and I think one of the relevant purposes is the purpose of the statute itself, right? And its principal purpose, as I understand it, is to ensure and maintain a standard of living necessary for the health, efficiency, and general well-being of workers. And that just doesn't seem to fit very well in a context where, by definition, a prisoner is a ward of the state, and it's the state who's responsible for all of those things that I just talked about. So why, I mean, why are we even talking about prisoners as employees within the compass of the act if, by definition, they just don't fit within that first principal purpose? We're talking about that because there's more purposes just than the minimal standards of U.S. workers throughout all industry. The minimal standards, the Supreme Court has held that you're still entitled to overtime even if you are well-paid. And the similar... I call them in the context of workers who are not wards of the state. In this particular instance, there are other purposes of the Fair Labor Standards Act that are clearly at issue. Notably, the purpose of the FLSA is to prevent unfair competition, and that is on, I think, evident display in this case based on Baltimore County's bailing and selling of recyclables and attracting other counties to send them their recyclables. This is not just a case of where Baltimore County was recycling its own materials. Baltimore County was playing in the same sandbox as other recyclers. It's a very limited sandbox, though, right? I mean, they're not beyond the scope that you just talked about. There's not a reach beyond that, right? Well, Baltimore County was recycling Hartford County's recycling, Cecil County's recycling, and those inmates were bailing the recycling materials from Hartford County and Cecil County. Baltimore County also had plans to go to Frederick County and get Frederick County to send them their recyclables. And, in fact, noted that in the joint appendix, it references that Baltimore County observed that Waste Management, which is a private waste hauler and publicly traded company, was already serving Frederick County. Baltimore County was also attracted to doing the work for Carroll County. And, indeed, there's additional sources in the joint appendix where Baltimore County was trying to do the recyclables for Pennsylvania counties, to go as far north as into Pennsylvania to get their recyclables and have these inmates sorting them based on these long hours at very low pay. Have we had cases where we've had a similar sort of incidental economic benefit or unfair competition and yet have found that it doesn't matter in the context of prisoners? Respectfully, no. I don't think that there's any case, except for Burrell v. Staff, the Third Circuit decision that involved inmates performing recyclable duties just like this, which the Third Circuit just last year held, was covered by the FLSA. Except for Burrell v. Staff, there's no case that's, I think, remotely like the facts here, where inmates were put to work in industry, in an industrial plant, to make money. I'm sorry, you talked about the county, Baltimore, trying to get recyclables from other counties. And what's in the record about what happens next? I understand at that point it's kind of sold in a commercial marketplace. Yes, so if you will, the materials come down a conveyor belt. They are sorted by the inmates. They are then bailed into what sounds like bails of hay. Likes with likes, right? We sort them and then we have a bail of one category of things and a bail of another. Then what happens to those bails? Those bails get placed onto trucks. I'm leaving out the important point, which is Baltimore County would have auctions to the highest bidder based on their bails of recyclables. Baltimore County touted themselves as having, and they did, in fact, have high-quality bails. Of course, you may imagine your own recyclables out at your curb. They get wet, they get dirty. Well, Baltimore County made sure that their bails were dry cardboard, which is of higher value on the market, than wet cardboard, which may have no value. And then they sold them. Oh, yes. I think we're missing, I'm just trying to get to the gist of your argument is that this is being done for profit. So I'm asking where is the profit coming from? The companies that trade, they purchase from waste management, they purchase from Republic Services, and they purchase from Baltimore County. And those bails of aluminum cans, for example, actually may find their way back on a store shelf within a matter of months. In the marketplace in which they are selling the high-quality separated recyclables, are there private participants in that marketplace? There are private participants, yes. Companies that are taking those basic commodities now and repurposing them. Are there other sellers? I'm sure there are private buyers. Are there other sellers of things like that? Thank you. I'm sorry. Yes, of course. The largest being waste management. Which is a private entity. Which is a private entity, publicly traded, which incidentally, in its security prospectus, warned that they were in competition with municipalities, and advised and further informed their investors that they didn't have the benefit of inmate labor. In your remaining time, could I ask you, at the very beginning, you said this is the rare and unusual case where the FLSA applies to workers. Can you just give me your capsule summary of what makes this the rare and unusual case? What are the characteristics of what we have here that make this, in your view, the rare and unusual case? Well, for one, I think the most obvious is that this is not prison housework, such as in the Danby versus CoreCivic, or prison industry, such as Harker versus State Use Industry. These individuals leave the prison, much like in work release, and the work does not benefit DOC. So, for example, in Harker, the inmates were making stationary, I believe stationary-type products, for use by the state government, and there was very limited amounts that may get past just the state's own use. In this particular case, which is so unusual, is that these individuals were put to work in this plant for the purpose, and county corrections did not use these recyclable materials. County corrections, this was not a state industry, excuse me, a prison industry, and of course this wasn't like chores, like mopping the floor or working in the prison library. Does it matter that the revenues, at least some of the revenues, are newer to the benefit of the facilities, the state facilities? The record, I believe, shows that the revenues from the recyclable sales fluctuated wildly. The witnesses testified to that. But they were approximately half of 1% of the overall Baltimore County budget. From that amount, the money being fungible, the money would then go to the various agencies. Well, whatever the amount is, is that relevant in considering whether or not we're talking about a purely commercial enterprise or something more akin to the cases where the FLSA hasn't been implicated? I think at best it's a factor, but of course this is a totality of circumstances. We don't see that this correction, excuse me, this DPW project, which is known as the MRF, the Material Recovery Facility, was not put into place to fund corrections, and this was not done to perform any particular corrections function. So to get back to the question of what other factors make this the unusual case, so this case involves actual production of goods that were put into interstate commerce, not by some amount of de minimis amount. The whole point of it was to run a business that was operating in interstate commerce and competing with other private waste haulers. And that, frankly, should be the end of the discussion. Once Baltimore County was operating a business, it should be held responsible for paying the wages required under the Fair Labor Standards Act. Additionally, this is an unusual case because someone other than corrections was paying the wages. You see the discussions in the case Henthorne v. Department of Navy or Watson v. Graves, where when the money is, when the inmates' wages are being paid from some other source than the Department of Corrections budget, then that's a factor in favor of finding FLSA coverage. And, in fact, Harker itself, and I should, of course, mention Harker's early 1990s case from this court involving inmates in a state, excuse me, a state-use industry. Harker itself was concerned about if we require minimum wages, that it would deplete the prison's budget. Here, this money was not coming from the prison's budget. It was coming from DPW, and DPW was raising money through the sale of the work of these individuals. Counsel, you're over time. Oh, I apologize. We've got some time left for rebuttal. Thank you. Mr. Johnson. Thank you, Your Honor. May it please the Court, my name is Jeff Johnson. I'm here with my co-counsel, Craig Long. We represent the appellee defendant in this matter, Baltimore County, Maryland. The district court in this case made a legal judgment based on principles first announced by this court in Harker and later reaffirmed in Nadambi that the Fair Labor Standards Act does not apply to the custodial context. Here, there's no dispute that the plaintiffs in this case remained in a custodial relationship with Baltimore County, Maryland, and worked exclusively for their custodian, the county, at all relevant times. For those reasons, we respectfully request that this court affirm the district court opinion below, finding that the plaintiffs were not employees as envisioned by the Fair Labor Standards Act. How much of your argument depends on this, Baltimore is just Baltimore is just Baltimore? Does your argument depend on that step? Your Honor, it's not entirely dependent on that step, but it is one of the considerations evaluated by the court in Harker as to the potential for unfair competition. The Seventh Circuit in Van Skyke, which was cited too heavily in Harker, observed that there's a fundamental difference between a government entity utilizing a benefit from inmate workers to pay for the cost of public goods and offset the cost of incarceration, which is exactly the case here. Well, the reason I ask about that is, I mean, it occurred to me that this question about, like, is a legal entity just a legal entity just a legal entity, right, and can they ever be multiple employers? So I thought, this seems like it might come up, and it turns out that it does. Are you familiar with 29 CFR 779.204C? This is the Department of Labor regulation about the question of whether, I mean, I'll just read. From your face, I'm gathering it's not. So, quote, this is a DOL regulation. The Act treats a separate enterprise, treats as separate enterprises different businesses, which are unrelated to each other even though they are operated by the same employer. That's 779.203, I'm sorry. And then 779.204C says the enterprise, the entity covered by the FLSA, is not necessarily coextensive with the entire business activity of an employer. A single employer may operate more than one enterprise. Doesn't that, that seems pretty on point to me. No, Your Honor, I would disagree with that because Baltimore County can't operate more than one enterprise. Is this Baltimore City or Baltimore County? Baltimore County, Mayor. Baltimore County, okay. Baltimore, why doesn't that say Baltimore County can operate more than one enterprise? One is a prison, one is a recycling center. Well, Your Honor, I would disagree with the notion that they're separate or separate enterprises. So here the evidence in the record is that the county administrative officer, who all of the agencies reported up to, made fundamental decisions about how much inmates would work on the detail, how much inmates were going to be paid on the detail, and other pivotal aspects of the work performed here. Who is that person again? County administrative officer. That's not the head of DOC. No, no, he is not. So the head of DOC and the head of the Department of Public Works, which are admittedly separate agencies of Baltimore County, but they work, and Mr. Homan testified, that interagency coordination in the Baltimore County government is common, and that both of these agencies reported up to Mr. Homan, and that Mr. Homan was making decisions both about how many inmates would work at the detail, what the county would do with its recycling operations, and also the rehabilitative interests of the county. So Mr. Homan testified that he sought to create a pathway to employment for inmates that were participating in this detail by hiring folks after their release from incarceration. So the notion that these are two agencies that were operating sort of separate and distinct from each other, but under the umbrella of the Baltimore County government, is just not supported by the evidence in this case. So can I, in terms of narrowing the discussion we're having, you concede that the paid temporary workers, not the incarcerated people, the other people who were working in these recycling facilities, you agree those individuals were employees covered by the act, right? Yes, they were paid a minimum wage. And you further agree that, my understanding is that some of the detainees were working for third-party employers on this work release arrangement? That other people who were also being detained, some of them were being released to go to work for private employers? There was a work release function of the community corrections program in this case, which was separate from work release. And do you agree when those folks were doing work release, they were employees under the act? Absolutely, Your Honor. Okay, so the dispute is about just these folks. Correct. Now, I'd like to turn to the point about what is the purpose of the detail and the rehabilitative interests here. And I think the court's decision in Nadambi is telling on that component of the court's analysis. There, the plaintiffs were working for a private corporation that had contracted with the federal government to operate an immigration detention facility. And in that case, the court observed that there is, of course, a pecuniary aspect of the work performed, and that the labor performed by the inmates in that case is reducing the labor costs of a private corporation whose very existence is to generate revenue and profits for shareholders. But the court in that case observed that notwithstanding the pecuniary aspects of the work performed, it did not defeat the rehabilitative or non-pecuniary aims of the detail. And in that case, the court noted that the voluntary work program was set up to provide the detainees or to avoid the difficulties associated with idleness and remaining inside of the detention center all day. I'm sorry, you should finish your sentence, and then I'll ask my question. I was just going to say, Your Honor, the court did not, in that case, view the two as mutually exclusive or one defeating the other, being the rehabilitative or non-pecuniary aims of the custodian. Right, and I think the district court read that case the same way and applied a standard, because the district court says there's evidence of profit motive, and there's also evidence of rehabilitative purpose. And as I read the case law, if there's any rehabilitative purpose at all, that's the question. Is there any rehabilitative purpose? And if so, it really doesn't matter what else is going on. Is that your position here, too? Any rehabilitative purpose would be sufficient to check that box? Your Honor, where the custodian of an inmate has testified to a rehabilitative aim of the detail, as was the case in Harker and Nadambi, the court has viewed that in light of the purpose of the relationship between the two parties. So, yes? Yes, Your Honor, but arriving at it from a different angle, which is the court has said that those stated aims of the work are going to be viewed in light of the nature of the relationship between the parties. And even the case law cited by plaintiffs notes that the relationship between the parties and the economic realities of that relationship are of paramount importance in deciding whether or not there's an employment relationship. And Judge Posner's decision on this issue from Bennett v. Frank, I think noted aptly, that individuals aren't incarcerated for the purpose of allowing them to maintain a minimum standard of living. Yeah, I'm sorry. I don't want to even be talking about minimum standard of living. Can we just stick with purpose for a minute? I just want to make sure I'm clear. Your position is that if there is any rehabilitative purpose at all, it could be like 95% pecuniary, 5% rehabilitative, that box gets checked in favor of the defendant. Because I don't quite read our cases that way. Well, Your Honor, I think where the rehabilitative aims aren't disputed, there's no material factual dispute on the rehabilitative aims of the work, there's no reason for the court to then second-guess that stated purpose for the work. Right, but we could say, why couldn't a court say, yeah, there's some minimal rehabilitative purpose, almost always will be when we're talking about inmate labor, but it looks like this program is being run predominantly to make money for the county. If I think that, let's just say I think a reasonable jury could find, yes, there is some rehabilitative purpose, or at least there was when this program was originated, but the way it is being run, or the way it was being run until this litigation was filed, the predominant purpose was to make money for the county. Does that still check the box, okay, but it's rehabilitative for the first Harkin factor? Your Honor, in that circumstance, which we would say does not apply to this case, there could be a factual dispute on that issue, which would justify the court not crediting the rehabilitative aims. Why couldn't the, why couldn't, I guess I'm saying, why do they have to be, couldn't you credit that there was at least originally some rehabilitative purpose, but also find that the predominant purpose as the program was run at the relevant time was profit-seeking? Like that wouldn't say, you wouldn't be saying anybody is lying. There's also a rehabilitative purpose, but the predominant purpose is making money. Your Honor, in the right case, I think the court could reach that conclusion, but our position is that this case is not the case. I'm sorry, now I'm confused. So why does it matter if the predominant purpose is a profit-making enterprise so long as, in Judge Harris's hypothetical, there is some rehabilitative aspects of the program and we're dealing with prisoners, who by definition are the wards of the state. Why are you running away from that example? I mean, it seems to me that's still something that you would prevail on, so long as it's not, you know,  Your Honor, I think the point of confusion here is we're talking about the purpose of the work and then pecuniary aspects of the activity performed. And here, the county's evidence in this case is that there is a rehabilitative, non-pecuniary aim of the work as confirmed by all of the correctional officials that were involved in this detail, as confirmed by the fact that the plaintiffs in this case were quite literally working in exchange for an earlier release date. Right, and Judge Harris doesn't dispute that when she asks her hypothetical, but we don't know, in this case, exactly how much of this enterprise was predominantly rehabilitative or something else, remunerative. But from my perspective anyway, I don't think that matters if you're dealing with individuals who I've said earlier, I think, are wards of the state. And if you look at the overriding purpose of the Act, which is to protect the health, welfare, and benefits of workers, that just doesn't fit in a context like this. I agree with that point, Your Honor, but I think we're talking about two different aims of the FLSA. But they're not inconsistent, I guess, is my point. You can have a profit-making motive for an agency or a prison, also have a rehabilitative motive, and those would not violate, in my mind anyway, violate the Act. It wouldn't implicate the Act. And that was my point in bringing up Nadambi, is that the Court has not viewed those two things as mutually exclusive. But in response to Judge Harris' questions, you seem to be suggesting that if there were a case where it was a predominantly profit-making enterprise with some aspects of rehabilitation, that might present a fact question for the jury. And I'm suggesting to you, at least from my perspective, it wouldn't. Well, Your Honor, and this Court certainly hasn't, in its prior decisions, viewed that as creating a material factual dispute. My point in responding to Judge Harris' question is just that there may be a case, which is not this case, where the Court could find that there is a predominant pecuniary motive for the work performed, not just an incidental pecuniary aspect of rehabilitation. What is the case where we've said that that presents a factual issue? There isn't one, Your Honor. Oh, okay. And I'm saying that there isn't. I misunderstood you. But is there any other aspect of FLSA law? Well, I guess I'm thinking of the intern cases, and I do understand inmates are different from interns. But where, you know, internships strike me as another place where you're obviously going to have, or you may frequently have, combined purposes. It's an educational opportunity for the intern. It also does some work for the, let's call it a putative employee. And there we ask, like, the question is, okay, what's primarily what's going on here? Why would, I guess your answer is this corner of the law is different because it's about inmates, and there is language in some of our opinions suggesting, like, inmates are just different. We don't apply normal FLSA principles. That's exactly right, Your Honor. And the prior decisions on this issue, including those from the Seventh Circuit and then Harker and Ndambi, the court has noted that work performed in the custodial context, again, informed by the relationship between the two parties, is designed to further the non-pecuniary or rehabilitative aims of the custodian. But if that's the rule, then it seems like a lot of our decisions could have been a heck of a lot shorter than they were. They could have just said, you're a prisoner doing work in prison. Go away. But they don't say that. They say, like, they generally aren't, and under the facts and circumstances of this case, the prisoner isn't. But you seem to be coming close to a very categorical rule that could have made a lot of our decisions much, much simpler to write. Well, Your Honor, this court's prior decisions addressed a few different considerations, not just the pecuniary or rehabilitative aspects of the work performed. And I would submit that the court's discussion of at least that factor has been fairly short in recognition of the relationship between the parties. But the court has gone on to consider concerns for unfair competition. Well, what about that? Like, why isn't that a bit of an issue here? If you have the county operating as sort of a market participant, not in a purely governmental capacity, and it's a market participant in a private market, and it obviously gets a huge advantage because it can use close to free labor. Like, how does that not skew the market for the private participants? Your Honor, a few different points to be made in response to that. The first is the court in Van Skuyk in the Seventh Circuit and then Harker recognized that Congress has already legislated in this area to redress a potential unfair competition. If that applies here, what are they doing putting the recyclables into the market? Are they violating that statute? The Asbury, I can't remember the name. Your Honor, I haven't analyzed the application of that statute. Well, given that they're putting this stuff into the interstate market, can't we assume that the statute doesn't apply? Like, I take it your point is not that the county is in just clear and flagrant violation of that statute. Yeah, the county is certainly not admitting or saying that it's violating a federal statute. But the court has said in previous decisions that... And where it applies. Well, the court has said the mere existence of the Asher-Sumders Act rebuts any notion that Congress, in light of the unfair... No, it doesn't. It says that where that statute already addresses the issue in front of us. We don't have to worry about putting it under the FLSA. But I don't think that statute addresses this situation, or if it does, Baltimore has a lot of explaining to do. Well, Your Honor, again, I would submit in Van Skuyk, which was relied on heavily in Harker, the court noted that the mere existence of the statute is relevant and important. And in that case... Okay, let's assume, I think, if that statute doesn't apply, we have a very serious, we appear to have a very serious risk of unfair competition in the private market in which Baltimore is participating. Well, Your Honor, my point in response to that would be that the county witnesses who were involved in the selling of recyclables in this case testified unequivocally that Baltimore County never sought to undercut the market or... You don't have to try to undercut the market. It doesn't matter what your purpose is here. It's just a fact. You can produce at a much lower rate than your private competitors because you alone get the benefit of close to free labor. But, Your Honor, as a matter of fact, there's no evidence in this record that the county ever sought to sell its recyclables for less than any private market participant. So they kept the difference. Their costs were lower, but they did not sell... There's no evidence in the record that they were underselling their competitors, underpricing their competitors. The evidence is to the contrary. The county said unequivocally that it never did that. And there's no evidence in the record that the county ever sought to undercut any of the private market participants that were referred to by Mr. Hoffman. Can I take you back to my question about how much it matters that Baltimore Baltimore? So keep every single fact in this case exactly the same, but change this one fact. This recycling center is operated by waste management under a contract with Baltimore County. Everything else about this case is exactly the same. That's the only difference. Do you think that makes a difference to the FLSA coverage question? Well, Your Honor, I think it would make this case more akin to those where other courts have recognized an employment relationship, notwithstanding the fact that we're talking about inmates. I think what Your Honor is alluding to is something more similar to the scenario that was confronted in Burrell. Sure is. What do you think the answer to that question is? By the Third Circuit. I would say that's a tougher case, Your Honor, but there are still factors addressed by Burrell that are not present here. Let me explain. How would I write... Here's... I'll flip this around. Is it possible to rule in your favor without saying something that is necessarily inconsistent with the Third Circuit decision, and what would one say? Yes, Your Honor, and there's a few things that one would say. I mean, the first is that Burrell noted that the inmates in that case were not incarcerated as a result of a criminal conviction. So we weren't confronted with the presumptions flowing from the Third Circuit. Sorry, this is my fault, not yours. Is there a way to write this opinion that doesn't... Again, let's go... not the Third Circuit case. This is a stylized hypo based on the Third Circuit case. Is there a way to write this opinion that does not necessarily say that even if this exact situation was operated by Waste Management under a county with both... Is there a way to resolve this case that does not foreordain the result of that case, where the only thing we change is whether Waste Management or the county is operating the recycling center? Yes, Your Honor, and I think the key distinction there would be the inmates in this case are still provided their minimum standard of living by the county in that circumstance, which was a notable fact that was addressed by the court in Burrell and is not present in this case. So the inmates in Burrell were... Again, they were civilly detained as a result of their failure to pay a child support obligation, and the court in that case noted that they needed a minimum standard of living or a minimum wage for a reason that most inmates and most persons in custody do not require a minimum wage. So that was an important consideration by the court in Burrell in addressing the concerns for unfair competition that were addressed as one of the legislative aims of the act. Let me ask what may be related to Judge Heitens' question in a slightly different way. Does this case come out the same way if instead of being sent to the county-operated recycling facility, they are being sent to a privately-operated facility? Your Honor, as I said, that's a much harder case, and I think that... And is there a way to... Yes. How do you think it comes out? Your Honor, I think that case would be more in line with Carter, Watson, and Burrell, where the court has, in fact, found an employment relationship. But the fact that the plaintiffs in this case are working solely for the benefit of the county is notable, and the court has recognized... Well, it's not just notable, and this goes back to, I think, Judge Heitens' first question. For you, it's dispositive. It's the one thing that takes this case out of what you are now describing as a separate bucket of cases where people are working for private employers. If you are... The one thing that separates it is that here, they're working for a different county entity. That's right, Your Honor, because that is the unifying factor in all of the cases that have applied the Fair Labor Standards Act to the custodial context. You know, in the example you were just given, I guess the question is, why is the FLSA the remedy for that problem with unfair competition? Maybe it is. Maybe that was what was intended. But I think if you read fairly the history of the Fair Labor Standards Act, I don't think Congress reasonably anticipated that the issue of prison labor was to be encompassed within the four contours of the act. Maybe the evolution of the law says that it now does apply or might apply. But why couldn't the issue of the imbalance and unfair competition be addressed in some other way other than applying the FLSA to a group of individuals who, as you've indicated, are within the custody of the state and are being provided very health benefits and the like that typically workers out in the civilian world have to bargain for? That's the whole purpose of the act is to allow them to be able to negotiate and bargain for those worker remedies that inmates just don't need to worry about because in theory, although sometimes not in practice, they are provided those very same benefits while incarcerated. Your Honor, and that's certainly one factor that this court has looked to in deciding that the inmates are not subject to the Fair Labor Standards Act. But in the decisions of, again, Carter, Watson, and Burrell, the court has overlooked that purpose and said if the inmates are working for a third-party private market participant, we're going to overlook the fact that they're still being maintained their minimum standard of living and decide that the FLSA applies in those circumstances. Have we said that? This court has not addressed that. But to Judge Hayden's point about how do we unify a decision in this case with the other precedent that's out there, I think that is the common unifying factor in those cases that is undisputedly not present in this case. And the Seventh Circuit precedent that was relied on heavily by Harker, again noted, there's a fundamental difference when a government entity is the sole benefit of inmate labor or workers. I mean, Harker distinguishes Watson, right? I kind of read us in Harker as saying we think Watson was right. That was an egregious case and the FLSA was properly applied. But you think we did not say that, Harker? No, no, I agree with that completely, Your Honor. The court cited to Watson as the extraordinary circumstances necessary to trigger the Fair Labor Standards Act. And in that case, the court confronted a situation where a parish jail was quite literally loaning out its inmates to a private construction business. They completely left the custody of the Department of Corrections. They were picked up by the owners of the construction business, worked their day, and then returned whenever the owner of the construction business felt it was appropriate. And that's not the case here, given that the inmates at issue remained in custody of correctional officers. They were transported to and from. But you think that, I mean, I thought you would say the main distinction here is that they were not working for a private party. They were working for the county. That's the main distinction. But the court also noted, and that's the point I'm making, is that they also completely left the custody of their custodian. I feel like the record's kind of factually difficult on exactly how much supervision there was at the facility. I think as you go on to elaborate other distinctions, I am thinking more and more, oh, that sounds like a jury question, exactly what was going on at this facility, how much supervision was there, who was driving the demand. Is it that DPW would say how many workers they needed, or was the prison saying this is the number of workers who would benefit from this rehabilitative opportunity? All of that seems very factually complicated to me. Your Honor, I would disagree with that point because the court's ultimate inquiry is to determine whether or not this work and this relationship fits within the traditional employment paradigm. So whether the supervision and level of custody at the detail was akin to what one would say. That's what you were just talking about. In distinguishing Watson, you were talking about the level of the exact same things I'm now talking about. But now you're telling me I shouldn't talk about them. No, I'm not saying that, Your Honor. I'm saying that there's no dispute in this case that the plaintiffs were escorted and accompanied by correctional officers to and from the detail and while they were present at the detail. The plaintiffs dispute the level or the stringent nature of what the correctional officers were doing, but the plaintiffs themselves have confirmed that there were correctional officers taking them to and from the detail that were present throughout the workday and then took them back, and that they also weren't free to walk off the job site, that their movement was restricted. So given those facts and given this Court's ultimate inquiry, which is to determine whether or not the work fits within the traditional employment paradigm, I don't think this Court, as a matter of law, could conclude that that reflects or is akin to what a worker in a free labor market has encountered. All right. Thank you, Mr. Johnson. Thank you, Your Honor. Mr. Hoffman. Thank you. I think it's important to note that custodial control was in place in Burrell versus Staff. The inmates in Burrell versus Staff were similarly escorted by correctional officers as the inmates were in Baltimore County to the Lackawanna MRF. So we think that the custodial control here is just one factor, but certainly not dispositive. A word about the custodial control. The correctional officers were retired. They could not apprehend and escape. That's JA 799-800. Wouldn't break up fights, JA 443. Unarmed, 799. Didn't always have inmates in their view, 800-801. Threw food to the birds. That's how they spent their day, 902-1722. And sat idle in the break room or office in interactions with inmates were extremely limited, and that's a number of declarations, 1344, 1350, 1667, 1672, 1761. What matters is, again, who is in control of the putative workplace, the workforce, excuse me, the relationship. And that is DPW. DPW set the schedule. In fact, Homan decided working time for staffing for this job, but there's no evidence he did it for other work details that the Department of Corrections had. DPW set the payment. DPW supervised these workers. DOC left inmate complaints to DPW that they were being driven like slaves. That's at 13, excuse me, 1033 to 1037. DPW did the training. DPW engaged in discipline and also handled productivity standards. This is not a case where these inmates are under the same custodial control as one might find in a prison. A word about the issue of rehabilitation, because I think it's an important one, if there's 95% profit seeking and 5% rehabilitation, what's the outcome? We don't see we have a 0% rehabilitation view on this case. In fact, I think this is really important. JA 929 to 930, Baltimore County actually does the court's work for it. It lists all the rehabilitation programs that they have. And none of them involve work. None of them involve the material recovery facility. They involve things like mental health wellness program, self-help anger management and job readiness, religious programs, and inmate resource fairs. None of them involve work. What if it were, what if a jury found it was 95% profit seeking and 5% rehabilitative? What do you think, how does that factor come out in your mind? We believe that the proper test under the totality of circumstances using economic realities is to determine what's the principal purpose of this work. If it was 51% profit seeking, we should win. And if it's 51% rehabilitative and 49% profit seeking, you think you would lose? We still win. Because when Baltimore County goes into business, it should be the end of the discussion. And about the minimal standards, it's not the minimal standards of the inmates or the specific worker in question, because preexisting entitlements do not determine whether an inmate is entitled to the Fair Labor Standards Act. Minimal standards talk about U.S. workers generally. These inmates working less than the minimum wage per force reduce wages and job opportunities in this industry. So it's my understanding that Baltimore County has not stopped recycling as a result of this litigation, right? That's my understanding. So I presume they're paying people to do this now? They are. They are. Can I ask you to respond to something your colleague said when I was asking questions about the effect on the private market? Do you agree that on the factual record we have, it's sort of undisputed, that Baltimore's prices were no lower as a result of the fact that they had to pay less for labor? Baltimore County was certainly in competition and considered themselves in competition, and I think they don't get to decide whether or not they were in competition. And the reason is because they literally were trying to steal a contract from waste management who performed the work for Frederick County and Carroll County. Baltimore County, by picking up the recycle, every time they picked up and bailed recyclables, it was less recyclables than a company like Waste Management could bail and sell and make money for its shareholders. So Baltimore County was clearly in competition, and I think the record demonstrates that. Now, there was the discussion of Ashurst-Sumners, and that came up earlier. Whether that law has any implications here, Ashurst-Sumners does not apply to prison labor when the work is done under a supervised release. So I think under the plain terms of Ashurst-Sumners, Ashurst-Sumners doesn't apply, and I don't think Baltimore County has conceded it applies in any event. The issue of rehabilitation is also critical when we talk about, I think there was a mention of the testimony from Baltimore County officials that this was rehabilitative. Aside from JA 930, which lists all the rehab programs, Baltimore County officials themselves testified that this wasn't rehabilitative. 688, Beachler, purpose of the MRF was not to rehabilitate inmates. 810, Robinson, the DPW supervisor, it wasn't any kind of, and I'm quoting, it wasn't any kind of rehabilitation or training opportunity. They ran it as a business, quote, unquote. Halligan, another Baltimore County official, 1278, main purpose of the MRF was to recycle and not rehabilitate inmates. Joint Appendix 1028, admission that harsh working conditions served no rehabilitative purpose, and also at 1028-29, the length of the day was not rehabilitative. The only thing that Baltimore County can maintain was rehabilitative was that it simply reduced idleness, or that the harsh conditions were so punishing that it's rehabilitative, but at 1028-1029, they back off of that, and idleness cannot be rehabilitative because if that was true, then every single work job by every single inmate would be rehabilitative, and therefore outside the protections of the Fair Labor Standards Act, but every single circuit, including, I submit, the Fourth Circuit, has held that inmates may be protected under the right case under the right set of facts, inmates can be protected by the Fair Labor Standards Act. Mr. Johnson, can I ask, this is more for my information than anything else, so with respect to traditional work release programs where you've got inmates who are going out into the economy and working for private employers, those individuals are always paid consistently with other workers in the economy? Is that the way it works? That's correct, yes. And is that by statute, regulation, or what's the? Well, actually, there's one district court opinion from the District of Maryland, Judge Brodar wrote in a case involving the suburban house deli, and I think it's MJJ, the citation is in our briefs, excuse me, but there is a citation saying private work release is covered by the Fair Labor Standards Act, and I think that's really the unchallenged assumptions by employers that inmates on private work release, if they're released to car washes or McDonald's or wherever they might go, will be covered by the Fair Labor Standards Act. In this particular case, we believe that these inmates were in a disguised work release program, and I think that one of the best pieces of evidence of that is that these inmates literally worked with non-incarcerated persons side by side who did the same work as sorters. And in that respect, this case is dramatically different than any other case that certainly this court has reviewed. I will say that with respect to Burrell, that the work here, excuse me, the work here was not compelled, whereas in Burrell, the plaintiffs there claimed that they were compelled to do the work. So we think we have a stronger case than Burrell because the work here was voluntary, one. And two, again, the inmates here worked alongside non-incarcerated workers. That's also a fact not present in Burrell. Lastly, I think the county makes some reference that Burrell involved a public-private partnership. Lackawanna County there turned to a private corporation to run its MRF. Here, Baltimore County didn't do that. But that doesn't make Baltimore County less involved in business. In fact, it only makes them more involved in business. In fact, Holman testified that he was, when getting rid of Baltimore County's private partner, which was known as MES, Holman testified at 588 that he was cutting out the middle person like waste management. All right, thank you, Mr. Hoffman. Thank you. We'll come down and recouncil and move on to our third case.
judges: Albert Diaz, Pamela A. Harris, Toby J. Heytens